E-FILED
Monday, 30 December, 2019  04:42:54 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| DANIEL DENEEN, AS INDEPENDENT ADMINISTRATOR OF THE ESTATE OF YINGYING ZHANG, DECEASED, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 19-CV-2149 |
| THOMAS G. MIEBACH, JENNIFER R. MAUPIN, and BRENDT A. CHRISTENSEN, | ) ) ) | |
| Defendants. | ) ) | |

## ORDER

Plaintiff, Daniel Deneen, as Independent Administrator of the Estate of Yingying Zhang, deceased, filed this lawsuit against Defendants, Thomas G. Miebach, Jennifer R. Maupin, and Brendt A. Christensen, alleging violations of the U.S. Constitution's Due Process clause pursuant to 42 U.S.C. § 1983 and Illinois state claims for negligence and battery.  Defendants Miebach and Maupin filed this Motion to Dismiss (#6) on August 19, 2019, to which Plaintiff filed his Response (#15) on October 8, 2019.  For the following reasons, Defendants' Motion to Dismiss (#6) is GRANTED.

## BACKGROUND

The following background is taken from the allegations in Plaintiff's Complaint (#1).  At this stage of the proceedings, the court must accept as true all material allegations of the Complaint, drawing all reasonable inferences therefrom in Plaintiff's favor.  See *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 966 (7th Cir. 2016).

Plaintiff is the court appointed Independent Administrator of the Estate of Yingying Zhang, Deceased.  He is a Public Administrator duly appointed by the Governor of the State of Illinois.  Defendants Miebach, Maupin, and Christensen were employed by the University of Illinois at Urbana-Champaign, which is governed by the University of Illinois Board of Trustees, a body corporate and politic, and acted under color of law.  The University of Illinois at Urbana-Champaign ("the University") is a public university located in the cities of Urbana and Champaign, Illinois.  All parties are citizens of the State of Illinois.

In May 2016, Defendant Christensen received his master's degree in physics from the University.  Shortly after earning his master's degree, Christensen began work as a graduate instructor at the University.

The University of Illinois at Urbana-Champaign Counseling Center ("UICC") is a clinic established by the University to help students and staff with mental health issues. Defendants Miebach and Maupin were employed as social workers at UICC.  On March 21, 2017, Defendant Christensen sought services at UICC where he reported that he had substance abuse problems with alcohol and prescription drugs and that he was experiencing suicidal and homicidal ideations.  On his intake form at UICC, Christensen self-reported that he had been abusing alcohol and it was ruining his life; he had been hospitalized for mental health concerns two to three times in the past; he had intentionally injured himself within the past year; he seriously considered attempting suicide two to three times, including within the past month; and he was currently taking medications for depression and sleep issues.  During this visit,

Christensen reported that he was previously treated for depression and sleep issues by a psychiatrist at McKinley Health Center, which is another clinic run by the University that provides care and treatment for emotional and behavioral difficulties of the students and staff at the University.

On another UICC document, entitled Counseling Center Assessment of Psychological Symptoms ("CCAPS") 62 Profile Report, Christensen rated close to or at 100% on scales measuring depression, generalized anxiety, family distress, substance abuse, and distress index.  During this initial assessment, Christensen demonstrated his symptoms were of the highest levels of severity where he apparently indicated that: he lost touch with reality; felt helpless; felt disconnected from himself; felt isolated and alone; suffered from spells of terror or panic; experienced recurring nightmares or flashbacks; experienced sadness or anger at the thoughts of his family; and wished for improved relations with his family.  He similarly affirmed the highest severity for his symptoms concerning alcohol abuse.

During this same visit, Christensen consented to a video recorded interview with an UICC student intern, Carin Molenaar.  During this interview, Christensen corroborated those symptoms and findings from his written assessment where he discussed his history of substance abuse, depression, sleep issues, marital issues, suicidal ideation, and most significantly, homicidal ideation.  He also recounted that his wife left him two days earlier and that he did not want to live anymore.  He further described that he had developed an obsession with serial killers.  Christensen also told UICC staff that he had chronically abused his depression medication prescribed by a

3

psychiatrist at the McKinley Health Center.  Molenaar scheduled Christensen for follow-up care with full-time UICC staff.

On March 30, 2017, Christensen saw Defendant Maupin, a master social worker at UICC.  Maupin performed an Alcohol and Other Drugs Assessment.  During this assessment with Maupin, Christensen revealed his suicidal ideations and his wife's recent abandonment.  Christensen told Maupin that he agreed to continue treatment in order to "continue to evaluate his risk for harm to [himself or] others."

Acknowledging his acute mental problems, Maupin referred Christensen to Defendant Miebach, a licensed clinical social worker for UICC, for additional care that same day.  During his subsequent assessment, Miebach found that Christensen had "passive suicidal ideations in response to conflicts inside his marriage."  Christensen revealed to Miebach that he thought about murder "in an analytical fashion," including killing a person and getting away with it.  Christensen also admitted to having purchased items that could be used in the transport and disposal of a body.

Plaintiff alleges that, throughout his visits at UICC, Christensen "relayed specific and plausible threats of harm to others" and "demonstrated a potential risk of safety to others."  Plaintiff further alleges that, throughout his visits at UICC, Christensen "identified concrete steps he had taken to harm another person where he admitted to purchasing items to transport and dispose of a human body."

Based on those visits to UICC, Plaintiff alleges that Defendants Miebach and Maupin "knew that Defendant Christensen satisfied the criteria of a high-level threat of harm to others."  Plaintiff alleges that Miebach and Maupin "knew that persons with

4

serious mental illness are significantly more dangerous than persons in the general population particularly those who are substance abusers."

Aware of Christensen's homicidal ideations and that his position as a faculty member at the University created a specific and identifiable threat to students in his community at the University, Miebach and Maupin affirmatively initiated a treatment plan for Christensen.  In taking these affirmative steps to address Christensen's homicidal ideations, Plaintiff alleges Miebach and Maupin acted with deliberate indifference to Christensen's known risk of harm to others at the University where they allowed Christensen to remain working as a graduate teacher in good standing, effectively encouraging him to believe that his homicidal ideations did not require immediate and long-term care.  "Based on information and belief," Plaintiff alleges that "through taking these affirmative steps to address Defendant Christensen's homicidal ideations, Defendants Miebach and Maupin, with deliberate indifference to Defendant Christensen's known risk of harm to others at the University, apparently ceased treatment without initiating any emergency or acute treatment options for Defendant Christensen to sufficiently safeguard the students at the University from the foreseeable threat of harm posed by Defendant Christensen, a faculty member."

Plaintiff alleges that Miebach's and Maupin's incomplete treatment plan failed to treat Christensen's symptoms to necessary resolution and that, accordingly, they "inferred" to Christensen that his treatment plan was satisfactorily concluded, which encouraged his homicidal ideations to become exacerbated and heightened. Though Christensen demonstrated unfitness to continue working as a graduate teacher with students, the treatment plan initiated by Defendants Miebach and Maupin did not include any intervention by University officials, human resources, or law enforcement. Moreover, despite this foreseeable threat of Christensen's homicidal potential toward the safety of University students, Plaintiff alleges that Miebach and Maupin acted with deliberate indifference and in a manner that shocks the conscience by discharging Christensen from their care without safely transitioning him back into the University community or providing adequate safeguards for the students.

Plaintiff's Complaint then details the disappearance of Yingying Zhang and the subsequent investigation into her disappearance. On June 24, 2019, Christensen was convicted of kidnapping resulting in death in relation to Yingying's disappearance. Christensen was sentenced to life in prison.

Plaintiff's Complaint contains five counts. In Count I, Plaintiff alleges that Defendants Miebach and Maupin violated Zhang's due process rights pursuant to 42 U.S.C. § 1983 via her wrongful death at the hands of Christensen. Plaintiff alleges Defendants Miebach and Maupin acted under the color of law as employees of the University. Plaintiff alleges that Miebach and Maupin knew that Christensen's homicidal ideations and his position as a University faculty member created an

"identifiable and specific threat of murder or great bodily harm" to University students, including Zhang.  Plaintiff alleges Defendants heightened the danger by responding to Christensen's ideations and undertaking a treatment plan without ensuring his symptoms had resolved, despite the known risk of harm to others at the University.  By telling Christensen his symptoms had resolved, even though the symptoms had not, they encouraged his homicidal ideations.

Plaintiff also alleges Maupin and Miebach created a heightened danger to students by encouraging Christensen to believe his ideations were benign, instead of malignant, and their inadequate response to his ideations implied to Christensen that his actions were permissible, thereby affirmatively increasing the risk of violence to University students and placing them (including Zhang) in a heightened danger they otherwise would not have faced.

Plaintiff further alleges that Defendants Miebach and Maupin acted with deliberate indifference to Christensen's known risk of harm to others by failing to initiate any emergency or acute treatment for him to sufficiently safeguard students from the foreseeable threat of harm posed by Christensen, despite their knowledge Christensen would remain a graduate teacher in good standing.  Plaintiff alleges Defendants' actions shocked the conscience by leading Christensen to believe his

homicidal ideations did not require continued care. They also shocked the conscience by discharging Christensen from their care without safely transitioning him back into the University community or providing adequate safeguards for students.

Plaintiff alleges these "repeated and sustained acts toward Defendant Christensen, knowing of Defendant Christensen's potential acts of violence, constituted prior assurances rising to the level of an affirmative condoning of private violence." Plaintiff alleges that Defendants Miebach and Maupin "effectively encouraged Defendant Christensen that he [would] not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the lives of the students at the University, including Zhang." "Zhang was a foreseeable victim and a member of a discrete class of persons that [were] exposed to the actions of Defendant Christensen[,]" and as a direct and proximate result of Defendants' foregoing conduct, Zhang suffered harm and eventual death.

Count II realleges the allegations in Count I, and is a federal due process survival action made pursuant to 42 U.S.C. § 1983 against Defendants Miebach and Maupin. Count III alleges Illinois common law negligence against Defendants Miebach and Maupin. Count IV alleges Illinois common law negligence, a survival action, against Defendants Miebach and Maupin. Count V alleges an Illinois state law battery claim against Defendant Christensen.

ANALYSIS

*Motion to Dismiss Standard*

Under Rule 12(b)(6), a complaint must state a claim to relief that is plausible on its face. *Sloan v. American Brain Tumor Assoc.*, 901 F.3d 891, 894 (7th Cir. 2018). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Sloan*, 901 F.3d at 894. However, where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012). Although a complaint's factual allegations are accepted as true at the pleading stage, allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion, and thus, accordingly, threadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice. *McReynolds*, 694 F.3d at 885. The plausibility standard calls for a "context-specific" inquiry that requires the court to draw on its judicial experience and common sense. *McReynolds*, 694 F.3d at 885.

*Plaintiff's Federal § 1983 Claims*

Plaintiff, in Counts I and II, alleges that Defendants' actions and omissions amounted to a "state-created danger" that resulted in Zhang's kidnapping and death. The U.S. Supreme Court has held that the Due Process Clause of the Fourteenth Amendment generally does not impose upon the state a duty to protect individuals from harm by private actors. *DeShaney v. Winnebago County Department of Social*

9

*Services*, 489 U.S. 189, 195-96 (1989).  There are two recognized exceptions to the *DeShaney* rule: (1) when a public official "affirmatively places a particular individual in a position of danger the individual would not otherwise have faced," the official may be liable for a due process violation if injury results; and (2) when the state has a "special relationship" with a person, that is, if the state has custody of a person, thus cutting off alternative avenues of aid.  *Estate of Her v. Hoeppner*, 939 F.3d 872, 876 (7th Cir. 2019).

The first exception to the *DeShaney* rule, for state-created dangers, is "quite narrow and reserved for 'egregious' conduct by state officials."  *Estate of Her*, 939 F.3d at 876.  That is the exception to *DeShaney* at issue in this case.  A due process claim of this kind requires proof of three elements: (1) the government, by its affirmative acts, created or increased a danger to the plaintiff; (2) the government's failure to protect against the danger caused the plaintiff's injury; and (3) the conduct in question "shocks the conscience."  *Estate of Her*, 939 F.3d at 876; *Johnson v. Rimmer*, 936 F.3d 695, 708 (7th Cir. 2019); *King ex rel. King v. East St. Louis School District 189*, 496 F.3d 812, 817-18 (7th Cir. 2007).

It should be noted that a recent decision of the Seventh Circuit, *Weiland v. Loomis*, 938 F.3d 917 (7th Cir. 2019), has called into question whether *DeShaney* actually allows exceptions outside of the state custody context, and whether the three-part state-created danger tests articulated in *Estate of Her*, *Johnson*, and *King* can be employed by courts as a recognized exception to the holding of *DeShaney*.  In *Weiland*, the court wrote that "[i]n recent years, the 'state-created danger' exception has been treated as if it were a rule of common law" and has been turned into a "'three-part test'[.]" *Weiland*, 938 F.3d

10

at 920.  The court went on to state:

> Every once in a while, a court should step back and ask whether local jurisprudence matches the instructions from higher authority.  If taken literally, the approach that *Johnson* attributes to *King* would have justified liability in *DeShaney*.  The Justices themselves saw the matter differently.  They hinted that the Constitution might support liability when a state has a duty that "arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." 489 U.S. at 200, 109 S.Ct. 998.  That is why the Constitution requires the state to supply prisoners with medical care and protect them from each other; having disabled resort to self-help (or to the market in private services), the state must provide a substitute.  Several decisions in this circuit find liability outside of prisons when the state has disabled or undermined self-help or sources of private assistance. See, e.g., *Paine v. Cason*, 678 F.3d 500, 510–11 (7th Cir. 2012); *Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993).  Those cases have a footing in *DeShaney* that the "three-part test" lacks.
>
> Other circuits have their own approaches.  *Estate of Romain v. Grosse Pointe Farms*, 935 F.3d 485 (6th Cir. 2019), discusses the "three-part test" (with parts different from those of *Johnson* and *King*) that the Sixth Circuit uses to evaluate claims of state-created danger.  Judge Murphy filed a concurring opinion, 935 F.3d at –––– – ––––, questioning whether the Sixth Circuit's approach can be reconciled with *DeShaney* and suggesting that it be refocused on the question whether the state has impaired the plaintiff's powers of self-help or ability to obtain help from others.  All three members of the panel joined this opinion, making it an alternate majority opinion.
>
> *Estate of Romain* did not need to decide whether the Sixth Circuit's approach should be revised, just as we do not need to decide whether *Johnson* and *King* are compatible with *Paine*, *Reed*, and *DeShaney*.  These subjects should be presented for consideration in some future case, when the outcome may turn on the difference.  For now, it is enough to say that even if Loomis is civilly and criminally liable as a matter of Illinois law, he is entitled to qualified immunity from a claim based on the federal Constitution, so the district court's decision is REVERSED.

*Weiland*, 938 F.3d at 921.

Despite questioning whether the three-part state-created danger test can be properly inferred from *DeShaney*, the *Weiland* court did not specifically overrule *Johnson* and *King*'s recognition of that exception and application of that test.  *Weiland*, 938 F.3d at 921.  Indeed, in a decision issued just one week after *Weiland*, the Seventh Circuit again recognized the state-created danger exception and applied the three-part test articulated in both *King* and *Johnson* and so recently questioned in *Weiland.  See Estate of Her*, 939 F.3d at 876.  Therefore, this court is bound to recognize the state-created danger exception, and will analyze Plaintiff's pleading according to the three-part test.

Defendants argue that Plaintiff's federal claims under § 1983 must be dismissed for four reasons: (1) Plaintiff does not plausibly allege Defendants (for purposes of this analysis, "Defendants" specifically refers to Miebach and Maupin, not Christensen) created or increased a danger to Zhang; (2) Plaintiff does not plausibly allege the actions of Defendants proximately caused Zhang's injuries; (3) Plaintiff does not allege conduct that "shocks the conscience"; and (4) Plaintiff's claims are barred by the doctrine of qualified immunity.

<u>Whether Plaintiff Plausibly Alleges Defendants Created or
Increased a Danger to Zhang</u>

 Plaintiff alleges that Defendants' undertaking of treatment, and then cessation of treatment, with regards to Christensen, increased or heightened the danger faced by Zhang.  Plaintiff argues that Defendants' decision to affirmatively provide treatment to Christensen meant they "injected themselves into the normal course of events" and their decision to "passively stand by" knowing that Christensen remained a threat to

the community violated due process.  Plaintiff further argues that, by encouraging Christensen to believe that his homicidal ideations were benign rather than immediate and dangerous, Defendants "facilitated affirmative acts that affected the status quo." Plaintiff argues that Defendants' treatment of Christensen encouraged him to believe that his behavior was normal, which triggered him to effectuate his plan of abduction and murder.

Defendants, in support of their motion, argue that Plaintiff has not pled any plausible facts enabling the court to know whether Defendants' alleged initiation and cessation of treatment had any effect on Christensen's danger to Zhang.  Defendants also argue that Plaintiff's allegations concern their conduct's "indirect" effect on Christensen, and that the Seventh Circuit has rejected a state-created danger theory premised on such claims.

The court finds instructive the Seventh Circuit's decision in *Doe v. Village of Arlington Heights*, 782 F.3d 911 (7th Cir. 2015), cited by Defendants.  In *Doe*, a female minor was drinking alcohol with a group of teenage males, and became highly intoxicated to the point that she could not hold her head up or keep her eyes opened. An apartment complex site manager observed the situation and called 911.  Arlington Heights Police Officer Mark Del Boccio arrived on the scene and witnessed one of the males holding Doe, the female minor, up from behind because she could not stand up by herself.  Del Boccio rolled down his window and spoke to the three males, and then allowed them to leave the scene with Doe.  Del Boccio spoke with the witness who called 911, who told him that the group had been drinking straight from a vodka bottle,

13

but Del Boccio told the witness the males were taking Doe home.  Del Boccio left the scene without asking Doe or any of the males for identification.  If he had, he would have learned one of the males was on probation for armed robbery and that Doe and the other males were minors.  Del Boccio reported to dispatch that he had checked the scene and the subjects of the 911 call were gone on arrival.  He also called off another officer, Patrick Spoerry, who had been called to the scene.  Doe was later sexually assaulted by the male with the armed robbery conviction.

Doe alleged that Del Boccio's actions implicated the state-created danger exception to *DeShaney*.  The trial court dismissed Doe's claim.  In analyzing her claim on appeal, the Seventh Circuit noted that to "create or increase" must not be interpreted so broadly "as to erase the essential distinction between endangering and failing to protect and thus circumvent *DeShaney*'s general rule."  *Doe*, 782 F.3d at 917.  "'When courts speak of the state's 'increasing' the danger of private violence, they mean the state did something that turned a potential danger into an actual one, rather than that it just stood by and did nothing to prevent private violence.'"  *Doe*, 782 F.3d at 917, quoting *Sandage v. Board of Commissioners*, 548 F.3d 595, 600 (7th Cir. 2008).  The court concluded that the exception did not apply to Doe's case, because "Del Boccio did not create the danger to Doe, nor did he do anything to make the danger to her worse[,]" but rather "[w]hen he left Doe with the three young males, he left her just as he found her, 'plac [ing] [her] in no worse position than that in which [s]he would have been had [he] not acted at all.'"  *Doe*, 782 F.3d at 918, quoting *DeShaney*, 489 U.S. at 201.  The court also rejected Doe's argument that Del Boccio's calling off Officer Spoerry created or

14

increased the danger to her, writing that "[h]ad Del Boccio had not called off Officer Spoerry or falsely reported to dispatch, we have no way of knowing what would have happened[,]" and positing that "Officer Spoerry might have failed at protecting Doe." *Doe*, 782 F.3d at 918.  The court concluded that:

> This is not a case in which Doe was safe, or even considerably safer, before Del Boccio acted. His alleged conduct did not turn a potential danger into an actual one; Doe was in actual danger already. Therefore, Del Boccio had no constitutional duty to protect her. But even if calling off Officer Spoerry violated Doe's constitutional rights, it was not clearly established and Del Boccio nonetheless would be entitled to qualified immunity.

*Doe*, 782 F.3d at 918.

Another case of import cited by Defendants is the Seventh Circuit's decision in *Wilson-Trattner v. Campbell*, 863 F.3d 589 (7th Cir. 2017).  In *Wilson-Trattner*, the plaintiff was involved in an abusive relationship with Roeger, a police officer.  On June 17, 2012, Roeger locked the plaintiff out of the house and sent her a text message saying "you fucked with the wrong person."  The plaintiff showed the text to a police officer who found nothing inappropriate about it and told the plaintiff "we can't help you; this is between you and him."  On June 29, 2012, Roeger became angry with the plaintiff, yelled at her, threw her against a wall, and choked her to the point she could no longer speak.  The plaintiff called police, who spoke with Roeger.  Roeger told the police that the plaintiff had hit him and he pushed her away to defend himself.  The police then spoke with the plaintiff and told her she could go to jail based on what Roeger said. The plaintiff felt intimidated and was too scared to present her side of the story, so she merely denied Roeger's account and told the officers she did not hit him until he

15

slammed her head into a wall.  The officers encouraged her to speak when she was ready to do so and left her with a domestic violence handout and business card.  The police department conducted an internal investigation into Roeger over the incident, with Roeger telling them he acted in self-defense and the plaintiff declining to discuss the incident so as not to get Roeger in trouble.  A report was written concluding that Roeger violated department regulations, but no specific personnel action was recommended.

On July 8, 2013, another incident occurred where Roeger became angry after seeing the plaintiff with another man, and sent her and the man numerous lewd and threatening text messages, including nude pictures and videos of the plaintiff.  Roeger told the plaintiff she had "fucked with the wrong person" and that he wished she would die.  The plaintiff filed a formal complaint with the police department, but the officer responding told her he saw nothing wrong with the texts, that he was "sick of dealing with this shit[,]" and that the plaintiff should not call the department for personal matters.  The police did tell the plaintiff to get a protective order, but she did not do so. The department also initiated an internal investigation.

Finally, on October 8, 2013, Roeger broke into the plaintiff's home, pushed her, punched a hole in her wall, and threatened her and a friend.  The police were called, and once again they told the plaintiff they were sick of getting her personal calls and would stop responding if she kept "crying wolf."  Roeger was subsequently arrested, pled guilty to criminal charges, and resigned from the department.  The plaintiff filed suit against the officers, alleging state-created danger.  The trial court granted summary

16

judgment in the officers' favor.

On appeal, the plaintiff argued that the officers' actions "conveyed the unmistakable message" to Roeger that they would not interfere with his on-going abuse, thereby emboldening him to reoffend and thus placing her at a greater risk of domestic violence than she would have faced had they done nothing at all. *Wilson-Trattner*, 863 F.3d at 593. The Seventh Circuit rejected her argument, finding that there is no indication "that any of these officers did anything to embolden Roeger or otherwise indicate that he could abuse Wilson-Trattner with immunity." *Wilson-Trattner*, 863 F.3d at 594. Importantly, the court found that there is no evidence that any officer directly encouraged Roeger or otherwise told him that he could abuse Wilson-Trattner with immunity. *Wilson-Trattner*, 863 F.3d at 594. On the contrary, the police responded to the plaintiff's call and interviewed both Roeger and the plaintiff. "While this may have fallen short of an optimal response, it at least would have conveyed to Roeger that [the department] did not consider the incident trivial." *Wilson-Trattner*, 863 F.3d at 594.

The court also rejected the plaintiff's argument that the officers' dismissive and indifferent attitude to each of the incidents endangered her by progressively emboldening Roeger, noting that the Supreme Court in *DeShaney* concluded that the inaction of state officials was insufficient to support a claim under the state-created danger doctrine, and that though the plaintiff "characterizes the Department's ineffectual response as affirmatively increasing the danger to her, such semantics cannot skirt precedent." *Wilson-Trattner*, 863 F.3d at 594-95. The court concluded that

"[m]ere indifference or inaction in the face of private violence cannot support a substantive due process claim" and that the plaintiff's theory that the officers "increased a danger to her by implicitly condoning violence against her is both questionable in light of *DeShaney* [] and unsupported by the facts." *Wilson-Trattner*, 863 F.3d at 596.

Applying *Doe* and *Wilson-Trattner* to the allegations in this case, the court finds Plaintiff does not state a claim that Defendants created or increased a danger to Zhang. In terms of any alleged "affirmative act," Plaintiff's allegations imply that, due to Defendants' improper/ineffective treatment, Christensen inferred that "they were encouraging him to believe that his behavior was normal."  However, nothing in Plaintiff's pleadings alleges that either Defendant directly encouraged Christensen or otherwise told him that he could act on his violent impulses with immunity.  See *Wilson-Trattner*, 863 F.3d at 594.  Further, any allegation on Plaintiff's part that Defendants increased a danger to Zhang by implicitly condoning Christensen's homicidal ideations is questionable in light of *DeShaney*.  See *Wilson-Trattner*, 863 F.3d at 596.

Plaintiff argues that Defendants "injected" themselves into the normal course of events, and then passively stood by knowing that Christensen remained a threat to the community.  However, Defendants did not "inject" themselves into events any more than the officers in *Doe* or *Wilson-Trattner*.  Those officers were called to the scene by 911.  Christensen sought out Defendants' help, visiting the UICC, and was evaluated by Defendants.  Plaintiff then argues that, after "injecting" themselves into the situation, Defendants "passively stood by" while knowing that Christensen remained a danger to the community.  This is an argument that, essentially, contends that Defendants' failure to properly intervene and treat Christensen affirmatively increased the danger to Zhang, but "[m]ere indifference or inaction in the face of private violence cannot support a substantive due process claim."  *Wilson-Trattner*, 863 F.3d at 596.  Though Plaintiff characterizes Defendants' ineffectual treatment as affirmatively increasing the danger to Zhang, the Seventh Circuit, as noted above, has held that "such semantics cannot skirt precedent."  *Wilson-Trattner*, 863 F.3d at 594.

Defendants did not create the danger to Zhang, or do anything to make the danger worse, but rather the treatment left Christensen just as Defendants found him, placing Zhang in no worse a position than that in which she would have been had Defendants not acted at all.  See *Doe*, 782 F.3d at 918.  Further, it is complete speculation that Defendants' initiation of the treatment plan, and failure to successfully see it through to completion, created or increased a danger to Zhang, as the court has no way of knowing what would have happened had Christensen never been treated by Defendants, and Christensen may have gone on to kidnap Zhang even if he had never

sought counseling at the UICC.  See *Doe*, 782 F.3d at 918.  Indeed, Plaintiff argues in his Response that "[b]y the time Christensen visited Miebach and Maupin, he stated that he had taken affirmative steps to realizing his manifested homicidal ideations where he purchased materials to kidnap and murder."

In support of his claim that Defendants created or increased the danger to Zhang through their action/inaction, Plaintiff cites to the Seventh Circuit's decision in *Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993).  In *Reed*, a drunk driver, Larry Rice, being pursued at high speeds down the interstate, crossed the center line and collided with a car being driven by the plaintiff, killing his wife and unborn child and injuring his daughters.  Two hours before the collision, defendant police officers had arrested Cathy Irby, but left Rice, who had been riding in Irby's car, inside the car with Irby's keys, although they knew or should have known that Rice was intoxicated.  The Seventh Circuit found that "[p]olice officers who remove sober drivers and leave behind drunk passengers with keys may be said to create a danger or at least render others on the road more vulnerable."  *Reed*, 986 F.2d at 1125.  The officers' actions in removing Irby, combined with their knowledge of Rice's intoxication, created their liability for the subsequent accident.  *Reed*, 986 F.2d at 1125.

The instant case is distinguishable from that confronting the court in *Reed*.  First, in *Reed*, by removing a safe driver from the road and not taking steps to prevent a dangerous driver from taking the wheel, "the defendants arguably changed a safe situation into a dangerous one."  *Reed*, 986 F.2d at 1127.  Here, in contrast, Plaintiff admits that Christensen was already having homicidal impulses and had taken concrete

20

steps towards acting on those impulses even before he was treated by Defendants. Defendants did not change a "safe situation" into a dangerous one, the situation with Christensen was already dangerous and would remain so. The actions of the police in *Reed* were much more affirmative, active, and instrumental in creating the immediate and specific danger than the allegations against Defendants in this case.

Further, in *Reed*, the threat of harm was "immediate," and had a "limited range and duration." *Reed*, 986 F.2d at 1127. As discussed more fully in the proximate cause section below, the threat in *Reed* was much more foreseeable than in the instant case. The actions of the police created a "specific danger," and that danger was "so evident" that the defendant officers could be held accountable by any injured party. *Reed*, 986 F.2d at 1127. In this case, however, Defendants did not create a "specific danger," and that danger was not "so evident" involving a limited range and duration. If anything, the danger was very unspecific, and the duration and range unlimited. Christensen was having "ideations," but there was no specific threat to any one person or group of students, and no specific timetable given to Defendants by Christensen indicating that homicidal action was imminent. Because Plaintiff's allegations do not state a claim that Defendants created or increased a danger to Zhang, Counts I and II of the Complaint must be dismissed.

21

<u>Whether Defendants' Failure to Protect Against the Danger
Proximately Caused Plaintiff's Injury</u>

Even if Defendants created or increased the danger to Zhang, Defendants argue that their actions/inactions were not the proximate cause of Plaintiff's injury because Zhang was not a foreseeable victim of Christensen's.  Plaintiff argues that he has sufficiently alleged proximate cause, as Defendants knew Christensen was a threat to others, yet they facilitated his homicidal tendencies when they undertook an inadequate treatment plan without urgently responding to Christensen's acute mental health issues.  Plaintiff further argues that Zhang was a foreseeable victim because she was a vulnerable Chinese scholar on the University's campus, and the "70% reduction in campus population during summer sessions, made [her] even more vulnerable to Christensen's predations."

Plaintiff's Complaint must allege facts suggesting that Defendants' conduct was the proximate cause of Zhang's death; that is, Zhang must have been a foreseeable victim of Defendants' acts.  See *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 828 (7th Cir. 2009).  In support of their argument that Plaintiff has not alleged proximate cause, Defendants cite to the Seventh Circuit's decision in *Buchanan-Moore*.  In *Buchanan-Moore*, Sidney Gray, a mentally ill man, was arrested at least 35 times on 77 charges between 1996 and 2006, many of which stemmed from violent attacks committed by Gray.  He was committed to the county mental health complex numerous times and placed on prescription medications.  Over the course of his stays there, it was apparent to county doctors that medications were successful in reducing Gray's assaultive

behavior.  However, he did not take medications when left unsupervised, leading the county to frequently contact his family following his release.

On June 13, 2006, Gray was detained by Milwaukee police after swinging a golf club at bystanders.  At a civil commitment hearing, city police and county doctors testified that Gray posed an immediate threat to others because of his assaultive behavior.  The judge agreed, and ordered Gray committed.  Less than a week later, the county released Gray with his necessary medications but without contacting his family. The next day, police arrested Gray for invading an occupied home and took him to the county jail.  Although the county knew that Gray's assaultive behavior could continue if he remained unmedicated, Gray was not administered his prescribed medications.

On June 24, 2006, while Gray remained in custody, Milwaukee police Officer Terrence Bender signed a criminal trespass complaint, drafted by the District Attorney's Office.  According to protocol, the task of physically delivering the complaint to be numbered and filed with the state court resided with Milwaukee police.  This was not done; the court never received the complaint, and Gray was released by the County on July 9, 2006.

Approximately one week later, essentially the same episode was repeated.  Gray again was arrested by City police for invading an occupied home, placed in the county jail, not administered his medication, and released four days later.  It is unclear why charges were not filed against Gray.

On July 22, 2006, Gray broke into a home by kicking in the front door.  The home's next door neighbor, Frank Moore, walked up to the lot line in the small area separating the homes; Gray emerged from the side door and shot Moore in the head, killing him.

Moore's family brought a § 1983 due process claim, alleging the defendant county and city actors' actions amounted to a state-created danger.  The district court granted judgment on the pleadings for the defendants.

The Seventh Circuit affirmed the district's court decision.  The court found that the plaintiffs could not satisfy the state-created danger exception's second element, proximate cause.  The court distinguished Gray's situation from that in *Reed*, where there was a familiar and specific danger that was limited in both scope and time.  The court found that the complaint did not "allege facts suggesting that Gray's access to a gun, or propensity toward homicide, were specific dangers that were familiar to the County[,]" and that "[w]hile Gray had been arrested for home invasion and assaultive conduct, Appellants do not allege that Gray had previously carried a weapon or shot someone."  *Buchanan-Moore*, 570 F.3d at 828.  Further, the court found that "Gray's acquisition of a gun, and its use on an innocent bystander" were events that were "unpredictable rather than legally foreseeable."  *Buchanan-Moore*, 570 F.3d at 828.

The court also distinguished *Reed* based on the potential victims.  In *Reed*, the court noted, the potential victims were in a small, defined group: the drunk driver in question jeopardized the safety only of those motorists traveling on the same highway, and only for a matter of hours.  In a few hours, the court, wrote, the threat would be

24

dispelled.  *Buchanan-Moore*, 570 F.3d at 828.  By contrast, the *Buchanan-Moore* complaint did not allege facts "suggesting that Gray posed a threat to a definable population[,]" and the court noted that "[d]angers to the public at large are insufficient for constitutional purposes."  *Buchanan-Moore*, 570 F.3d at 828.  "The complaint alleges no facts suggesting that the County knew that Moore, as distinguished from the public at large, faced any special danger."  *Buchanan-Moore*, 570 F.3d at 828.

Further, the court rejected the plaintiffs' argument that Moore was a foreseeable victim because he lived on Milwaukee's "north side," the same section of town in which the county released Gray.  The court acknowledged that the district court took judicial notice of the fact that Milwaukee's north side represented a large geographic and heavily populated area, and that "the danger posed to Moore by his geographic locale was shared by the thousands of others who lived in that section of town as well as those living in any community accessible to Gray by foot, and perhaps even by public transit. Such a generalized, amorphous zone of danger is insufficient to trigger a state duty to protect."  *Buchanan-Moore*, 570 F.3d at 828.  Further, the court found that, unlike in *Reed*, the danger was not of limited duration, because to the extent Gray posed any foreseeable danger upon his release, it was a danger that was indefinite, as his mental illness and propensity for criminal acts existed without temporal boundaries.  *Buchanan-Moore*, 570 F.3d at 829.

The court finds that the threat posed by Christensen, in terms of Zhang's foreseeability as a potential victim, is similar to the foreseeability of the threat posed by Gray to Moore in *Buchanan-Moore*.  First, Plaintiff does not allege facts suggesting that Christensen posed a threat to a definable population.  Plaintiff alleges that Christensen was a danger to, specifically, University students, but there is nothing alleged that Christensen made any specific homicidal threats, to Defendants or anyone else, regarding University students, let alone Chinese scholars or a specific person, as opposed to a general threat to the public at large.  Dangers to the public at large are insufficient for constitutional purposes.  *Buchanan-Moore*, 570 F.3d at 828.  Plaintiff alleges no facts suggesting that Defendants knew that Zhang, as distinguished from the public at large, faced any special danger.  See *Buchanan-Moore*, 570 F.3d at 828.

Further, even if the court were to consider Plaintiff's claim that Christensen was a foreseeable danger to the University population (as opposed to the Champaign-Urbana population or area population in general), the University, like the "north side" of Milwaukee, still represents a large geographic and heavily populated area.  As of Fall 2017, according to the University of Illinois website, the total enrollment at the University was 47,826 (https://oiir.illinois.edu/about/demographics) (Last visited December 30, 2019), and the population of Champaign County in general, according to the U.S. Census Bureau website, is 209,983 (https://www.census.gov/quickfacts/fact/table/champaigncountyillinois/PST045218) (Last visited December 30, 2019).  The court may take judicial notice of facts from public documents such as census figures.  *Barnett v. Daley*, 32 F.3d 1196, 1198 (7th Cir. 1994);

26

*Buchanan-Moore*, 570 F.3d at 828 n.1.  Just as in *Buchanan-Moore*, the danger posed to Zhang by her geographic locale was shared by the thousands of others who worked and attended class on campus, as well as those living in any community accessible to Christensen by foot, public transit, or his own vehicle.  Such a generalized, amorphous zone of danger is insufficient to trigger a state duty to protect.  *Buchanan-Moore*, 570 F.3d at 828.  Plaintiff argues that the campus population was greatly reduced during the summer when Zhang was kidnapped, but such an argument is unavailing, as the campus population (not to mention the Champaign-Urbana population) is still well into the thousands, and Christensen was seen and treated by Defendants in March, during the normal school year.

Further, as in *Buchanan-Moore*, and unlike in *Reed*, the danger posed by Christensen was not of limited duration, because to the extent he posed any foreseeable danger following his treatment by Defendants, it was a danger that was indefinite, as his homicidal ideations and propensity for criminal acts existed without temporal boundaries.  See *Buchanan-Moore*, 570 F.3d at 829.

Zhang's death was simply too remote a consequence of Defendants' alleged actions to hold them responsible under the federal civil rights law.  See *Buchanan-Moore*, 570 F.3d at 829.  Because Plaintiff's allegations do not state a claim that Defendants were the proximate cause of Plaintiff's injury, Counts I and II of the Complaint must be

dismissed.  Because the court has already found the first two state-created danger

exception elements to be unsatisfied, the court need not address the "shocks the

conscience" element.

Qualified Immunity

Defendants next argue that they are entitled to qualified immunity regarding

Plaintiff's constitutional claims, because Plaintiff cannot plead a violation of Zhang's

constitutional rights, and, even if he can, he cannot show that the rights were "clearly

established."  Plaintiff responds that the issue of qualified immunity should not be

resolved at the pleadings stage.  On the merits of the qualified immunity issue, Plaintiff

argues that "the right to be free from a 'state-created danger' is well-settled."

The U.S. Supreme Court has mandated a two-step sequence for resolving

government officials' qualified immunity claims, in that the court must decide: (1)

whether the facts the plaintiff has alleged make out a violation of a constitutional right;

and (2) whether the right at issue was "clearly established" at the time of the

defendants' alleged misconduct.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  The

plaintiff has the burden to show that a particular right is clearly established.  *Hardeman*

*v. Curran*, 933 F.3d 816, 820 (7th Cir. 2019).

First, the Seventh Circuit has determined qualified immunity issues at the

pleadings stage.  See *Weiland*, 938 F.3d at 919-21; *Harrell v. Cook*, 169 F.3d 428, 432-33 (7th

Cir. 1999).

28

Second, the court finds that Defendants are entitled to qualified immunity.  As noted above, Plaintiff has not alleged facts that make out the violation of a constitutional right.  However, even if Plaintiff had alleged such facts, the right at issue was not clearly established at the time of Defendants' alleged misconduct.

To be "clearly established," a constitutional right "must have a sufficiently clear foundation in then-existing precedent."  *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019).  The principle of fair notice pervades the doctrine, with qualified immunity applying unless the specific contours of the right "'were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'"  *Campbell*, 936 F.3d at 545, quoting *Plumloff v. Rickard*, 572 U.S. 765, 778–79 (2014).  Given this emphasis on notice, clearly established law cannot be framed at a high level of generality, and a rule is too general if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that the rule was firmly established.  *Campbell*, 936 F.3d at 545.

Existing case law must dictate the resolution of the parties' dispute, so while a case directly on point is not required, "'precedent must have placed the ... constitutional question beyond debate'[.]"  *Campbell*, 936 F.3d at 545, quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017).  In other words, "a right is clearly established only if 'every reasonable official would have understood that what he is doing violates that right.'"  *Campbell*, 936 F.3d at 546, quoting *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015).  "The Supreme Court's message is unmistakable: Frame the constitutional right in terms granular enough to provide fair notice because qualified immunity 'protects all but the plainly incompetent

or those who knowingly violate the law.'"  *Campbell*, 936 F.3d at 546, quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

In *Weiland*, a recent qualified immunity case before the Seventh Circuit, a pretrial detainee attempted to commit suicide and was taken from the county jail to a local hospital for treatment.  His guards were instructed to keep him shackled.  One of those guards disobeyed that order when the detainee said he needed to use the bathroom.  The detainee subsequently seized the guard's gun, escaped, and terrorized hospital staff and patients, holding nurses at gunpoint and assaulting two of them.  Two of those injured sued under § 1983, alleging a state-created danger when the guard allowed the detainee to escape.  The defendants moved to dismiss under qualified immunity, which the district court denied, finding that the state-created danger exception was long established in the Seventh Circuit.

The Seventh Circuit reversed, finding that the court should have dismissed the claim because the defendants had qualified immunity.  The district court in *Weiland* essentially found the right at issue to be "clearly established" because the "state-created danger" exception had been acknowledged in the Seventh Circuit since, at least, the *Reed* case.  The Seventh Circuit rejected this reasoning, finding that the district court framed the right at issue using too high a level of generality.  *Weiland*, 938 F.3d at 919.

Rather, the Seventh Circuit wrote, the right in question must be established with *specificity*. *Weiland*, 938 F.3d at 919. The court noted that a search for a case with identical facts is not required to establish specificity, and "would be a fool's errand[,]" because "[a] principle can be clearly established without matching a later case's facts." *Weiland*, 938 F.3d at 920. Rather, "[t]he search is for an appropriate level of generality, not the most particular conceivable level[,]" and "the level of generality is appropriate when it establishes the rule in a way that tells a public employee what the Constitution requires in the situation that employee faces." *Weiland*, 938 F.3d at 920. The court found that no rule required guards to prevent prisoner escapes, and that every appellate court to consider the possibility had rejected such a rule as incompatible with *DeShaney*. *Weiland*, 938 F.3d at 920.

Plaintiff cannot show that the right he alleges is clearly established. An appropriately defined right is clearly established if (1) there is a closely analogous—though not necessarily identical—case identifying that right, or (2) if the defendant's conduct was so egregious and unreasonable that no reasonable official could have thought he was acting lawfully. *Hardeman*, 933 F.3d at 820. Plaintiff, in arguing against qualified immunity, cites to no cases with facts similar or even analogous to the instant case to support his claim that the right at issue was "clearly established" in 2017. Rather, Plaintiff essentially adopts the position of the district court in *Weiland*, that, based on *Reed*, the "state-created danger" doctrine is established in the Seventh Circuit and it should have been obvious to any social worker/counselor that such a danger exists when they "encourage and condone an obviously homicidal

31

patient to manifest his homicidal tendencies onto the foreseeable victims in the University community."

Plaintiff argues that *Weiland* does not support a finding of qualified immunity in the instant case because "*Weiland* cites the *Reed* decision to reiterate that the guiding principle for 'state-created danger' is when the state has disabled or undermined self-help or sources of private assistance[,]" and, "[i]n this case, it is clearly established that 'state-created danger' exists when a state actor encourages and condones an obviously homicidal patient to manifest his homicidal tendencies onto the foreseeable victims in the University community."  Plaintiff, however, errs in the same way that the district court in *Weiland* erred.

Here Plaintiff has framed the qualified immunity question in very broad terms, alleging that the "state-created danger" exception was well-established in this circuit, and that Defendants should have known that failing to properly treat Christensen and "encouraging" him to act on his homicidal ideations implicated that exception and violated Zhang's due process rights.  That formulation is far too general.  "The dispositive question is whether the violative nature of *particular* conduct is clearly established."  *Hardeman*, 933 F.3d at 820 (emphasis in original).  Plaintiff cites to no cases finding that social workers or counselors committed due process violations due to failure to properly treat known violent offenders who go on to commit violent assaults, let alone patients like Christensen who had no prior reported criminal activity, no history of violent assaults on others, and had not expressed a homicidal threat to any specific person or population.

32

As noted above, the court has found *Reed*, the one case Plaintiff has cited in his Response in opposition to Defendants' qualified immunity argument, distinguishable from the instant case. The broad principle of the state-created danger exception has support in Seventh Circuit case law, but the circumstances of the instant case have not been applied in a factual context specific enough to provide fair notice to Defendants that their conduct was unconstitutional. See *Campbell*, 936 F.3d at 546. Plaintiff can cite to no cases in this circuit or from the U.S. Supreme Court that would place Defendants on fair notice of the unconstitutional nature of their conduct. See *Campbell*, 936 F.3d at 546. The problem with Plaintiff's reasoning is that it starts and ends at a high level of generality. See *Weiland*, 938 F.3d at 919.

Further, for many of the reasons articulated above, the court also finds that Defendants' alleged conduct was not so egregious and unreasonable that no reasonable social worker or counselor could have thought they were acting lawfully. See *Hardeman*, 933 F.3d at 820. Plaintiff does not allege that Defendants saw Christensen more than one time each, and while he expressed homicidal ideations, he had no prior criminal or violent history towards others. He made no specific threat to a particular person or population. Plaintiff argues that Defendants' initiation of treatment and subsequent failure to successfully complete treatment essentially "encouraged" Christensen to believe his homicidal ideations were benign, thereby implicitly condoning his violence. However, the Seventh Circuit has held that even if a plaintiff could state a violation of a constitutional right by alleging a theory that state officials "increased a danger" by "implicitly condoning violence" against them, the defendant

33

officials would be entitled to qualified immunity because the unconstitutionality of such

an action "is far from clearly established under *DeShaney*." *Wilson-Trattner*, 863 F.3d at

596 n.4.

Thus, even if the court were to find that Plaintiff had alleged the violation of a

constitutional right, such right was not clearly established at the time of Defendants'

conduct, and thus qualified immunity applies to bar Plaintiff's § 1983 claims.

<u>Supplemental Jurisdiction</u>

Plaintiff's state law claims, for negligence against Defendants Maupin and

Miebach and for battery against Defendant Christensen, remain pending.  This case is in

federal court due to Plaintiff's § 1983 claims.  It is not here on diversity grounds, as

Plaintiff has alleged that all parties are citizens of Illinois.  In order to keep the case in

federal court, this court must exercise supplemental jurisdiction over the remaining

state law claims.

"The supplemental jurisdiction statute provides that a district court 'may' decline

to exercise jurisdiction over supplemental state-law claims for several enumerated

reasons, including where 'the district court has dismissed all claims over which it has

original jurisdiction.'" *In re Repository Technologies, Inc.*, 601 F.3d 710, 724 (7th Cir. 2010),

quoting 28 U.S.C. § 1367(c)(3).  This decision is committed to the sound discretion of the

district court, and in cases such as this one where the district court disposes of the

federal claims before trial, the Seventh Circuit will reverse the district court's decision to

relinquish supplemental jurisdiction over state-law claims "only in extraordinary

circumstances." *Repository Technologies,* 601 F.3d at 724-25, quoting *Contreras v. Suncast*

*Corp.*, 237 F.3d 756, 766 (7th Cir. 2001).  Indeed, when all federal claims in a suit are

dismissed before trial, there is a "presumption" that the court will relinquish

supplemental jurisdiction over the supplemental state law claims.  *RWJ Management Co.,*

*Inc. v. BP Products North America, Inc.*, 672 F.3d 476, 479 (7th Cir. 2012).

In cases where the district court has dismissed all claims over which it has

original jurisdiction, the presumption that the court will relinquish supplemental

jurisdiction may be rebutted if one of three circumstances is present: (1) the statute of

limitations has run on the pendent claim, precluding the filing of a separate suit in state

court; (2) substantial judicial resources have already been committed, so that sending

the case to another court will cause a substantial duplication of effort; or (3) when it is

absolutely clear how the pendent claims can be decided.  *RWJ Management*, 672 F.3d at

480.

First, there is no statute of limitations issue with regard to the common law

negligence claims against Defendants.  The Seventh Circuit itself has noted that §

1367(d) explicitly tolls the statute of limitations for 30 days after dismissal of a

supplemental claim, to allow the plaintiff to refile the claim in state court without being

time-barred.  *Williams Electronic Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007).

Second, this case has not yet gone to trial or even proceeded to discovery, thus

"substantial federal judicial resources" have not been expended on the resolution of the

state law claim.

Finally, it is not absolutely clear how the pendent claims will be decided.  The

negligence claims (the battery claim has not been addressed in this motion) are

somewhat related to the § 1983 claims, but are based entirely on Illinois state law, and are subject to a different standard.  Much of this order has been spent detailing how § 1983 claims alleging state-created danger and deliberate indifference must allege more than mere negligence.  Simply because the court has found no plausible allegation based on a state-created danger involving deliberate indifference, does not mean that an Illinois court applying Illinois law could not find a plausible negligence allegation.  The court's ruling on one issue does not determine the second.  Therefore, the court will relinquish supplemental jurisdiction over the state law claims pursuant to § 1367(c)(3).

IT IS THEREFORE ORDERED:

(1)     Defendants' Motion to Dismiss (#6) is GRANTED.  Counts I and II of Plaintiff's Complaint are DISMISSED.  The court relinquishes supplemental jurisdiction on the remaining counts, which are dismissed without prejudice.

(2)     This case is terminated.

ENTERED this ____30th____ day of ____December_____, 2019.

COLIN S. BRUCE
U.S. DISTRICT  JUDGE